JOHNSON & WEAVER, LLP
FRANK J. JOHNSON (174882)
frankj@johnsonandweaver.com
600 West Broadway, Suite 1540
San Diego, CA  92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

MICHAEL I. FISTEL, JR.
michaelf@johnsonandweaver.com
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BART STADNICKI, Derivatively and on Behalf of Nominal Defendant LENDINGCLUB CORPORATION,<br><br>         Plaintiff,<br><br>    v.<br><br>RENAUD LAPLANCHE, CARRIE L. DOLAN, SCOTT SANBORN, DANIEL T. CIPORIN, JEFFREY CROWE, REBECCA LYNN, JOHN J. MACK, MARY MEEKER, JOHN C. MORRIS, LAWRENCE H. SUMMERS, and SIMON WILLIAMS,<br><br>         Defendants,<br><br>    -and-<br><br>LENDINGCLUB CORPORATION, a Delaware corporation,<br><br>         Nominal Defendant. | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

By and through his undersigned counsel, Plaintiff Bart Stadnicki ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant LendingClub Corporation ("LendingClub" or the "Company") and against certain current and former officers and directors of the Company for issuing a false and misleading proxy statement in violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duties, unjust enrichment, corporate waste, and insider selling.  Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by LendingClub and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on LendingClub's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from the related securities fraud class actions pending in this District: *Steve Evellard v. LendingClub Corp., et al.*, Case No. 3:16-cv-02627 (N.D. Cal.) and *Nicole Wertz v. LendingClub Corp., et al.*, Case No. 3:16-cv-02670 (N.D. Cal.) (the "Federal Securities Class Actions"), as well as the securities class actions pending in the Superior Court of the State of California, County of San Mateo: *Alton Consulting, LLC v. LendingClub Corporation, et al.*, Case No. CIV538762; *Huang v. LendingClub Corporation, et al*., Case No. CIV537637; *Kearns v. LendingClub Corporation, et al.*, Case No. CIV537633; and *UA Local 13 Pension Fund v. LendingClub Corporation, et al.*, Case No. CIV537868 (the "State Securities Class Actions," and collectively with the Federal Securities Class Actions, the "Securities Class Actions"); and (e) review of other publicly available information concerning LendingClub and the Individual Defendants (defined below).

**NATURE AND SUMMARY OF THE ACTION**

1.  This is a shareholder derivative action brought on behalf of the Company that seeks to remedy wrongdoing by LendingClub's board of directors (the "Board") and certain senior officers (collectively, the "Individual Defendants") between December 11, 2014 and the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                        - 1 -

1   present (the "Relevant Period").  During this time, the Individual Defendants breached their

2   fiduciary duties owed to LendingClub and its shareholders by, among other things, causing the

3   Company to violate federal and state laws governing disclosures to shareholders by issuing false

4   and misleading statements in financial reports filed with the SEC during the Relevant Period.

5       2.    LendingClub describes itself as an online marketplace connecting borrowers and

6   investors.  LendingClub's marketplace facilitates various types of loan products for consumers

7   and small businesses.  The loans products include unsecured personal loans, super prime

8   consumer loans, unsecured education and patient finance loans, and unsecured small business

9   loans.  The Company purports to lower the cost of borrowers' credit while allowing investors to

10  use LendingClub to earn "attractive" returns "from an asset class that has generally been closed to

11  many investors and only available on a limited basis to large institutional investors."

12  LendingClub has facilitated approximately $16.0 billion in loans between borrowers and investors

13  since it first launched in 2007, according to its Form 10-K for the fiscal year ended December 31,

14  2015, filed with the SEC.

15      3.    During the Relevant Period, the Individual Defendants made and caused the

16  Company to make materially false and misleading statements regarding the Company's business,

17  operations, and financial prospects because the public filings failed to disclose material adverse

18  information about the Company that the Individual Defendants knew or should have known.

19  Specifically, the Individual Defendants made or caused the Company to make false and/or

20  misleading statements and/or failed to disclose that: (i) LendingClub had an unsustainable

21  business model that was predicated on it being able to issue loans with extremely high and/or

22  usurious rates across the country; (ii) LendingClub's loan investors would not be able to enforce

23  the extremely high and/or usurious rates imposed by LendingClub because they violated state

24  usury laws; (iii) without the extremely high and/or usurious rates, the loans generated through

25  LendingClub's marketplace would not be attractive to investors because the loans had very high

26  credit risk and were subject to issues concerning insufficient documentation; (iv) a substantial

27  portion of LendingClub's loans were issued with rates in excess of those allowed by applicable

28  state usury laws; (v) LendingClub's internal controls were inadequate to ensure that the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT         - 2 -

1    Company's loans conformed to its customers' criteria; (vi) LendingClub's internal controls were

2    inadequate to ensure that relevant interests in third-party transactions were fully and timely

3    disclosed; (vii) LendingClub is not a "pure marketplace" and instead has direct exposure to some

4    of the loans it makes; and (viii) as a result of the foregoing, the Company's public statements

5    were materially false and misleading at all relevant times.

6        4.    On May 22, 2015, the weakness of LendingClub's business model began to

7    emerge after the Second Circuit held, *inter alia*, that assignees and third-party debt buyers could

8    not rely on the National Bank Act to export interest rates that were legal in one state, but usurious

9    in another, to the states where those rates were impermissible.  This decision severely threatened

10   the collectability of a significant portion of LendingClub's business.

11       5.    In addition, during the Relevant Period while the Company's stock price was

12   artificially inflated due to the false and/or misleading statements and/or failures to disclose by the

13   Individual Defendants, some of the Individual Defendants engaged in lucrative insider sales of the

14   Company's stock.  The Individual Defendants collectively received over $48 million in proceeds

15   from their insider sales.

16       6.    On May 9, 2016, LendingClub disclosed in a SEC filing that on May 6, 2016, the

17   Company's board of directors had accepted the resignation of Defendant Renaud Laplanche

18   ("Laplanche") as the Company's Chairman and Chief Executive Officer ("CEO").  The Company

19   reported that Laplanche's resignation was precipitated by an internal review that found that the

20   Company had sold $22 million in loans, made to consumers with low credit scores, to a single

21   investor (later reported to be Jefferies LLC ("Jefferies")), in violation of the investor's "express

22   instructions."

23       7.    In the same May 9, 2016 filing, the Company also disclosed "a failure to inform

24   the board's Risk Committee of personal interests held in a third party fund while the Company

25   was contemplating an investment in the same fund."  Media outlets subsequently reported that

26   Laplanche had failed to fully disclose a personal interest he held in Cirrix Capital, L.P. ("Cirrix

27   Capital") while the Company was contemplating investing in the fund—an investment that

28   Laplanche had himself proposed to LendingClub's risk-management committee—and that

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                            - 3 -

1  LendingClub board member John Mack ("Mack") also held an undisclosed interest in Cirrix

2  Capital.   Additionally, LendingClub said its Risk Committee approved an investment by

3  LendingClub itself into Cirrix Capital—without the knowledge of the prior investment by

4  Laplanche.

5          8.      Combined, the Company, Laplanche, and Mack owned at least 31% of Cirrix

6  Capital, according to Bloomberg News, and Cirrix Capital has reportedly invested over $175

7  million into notes sold on the Company's marketplace.   Laplanche's and Mack's personal

8  investment in Cirrix Capital was a blatant conflict of interest the Board knew or should have

9  known about prior to the Company's investment in Cirrix Capital.

10          9.      After the market closed on May 9, 2016, news outlets additionally reported that the

11  SEC was investigating LendingClub's disclosures.   Then, on May 10, 2016, Bloomberg and other

12  news outlets reported that Goldman Sachs and Jefferies had halted their purchases of

13  LendingClub loans.   That same day, the U.S. Treasury Department issued a White Paper

14  describing the online lending industry as "untested" and calling for more regulation.

15         10.     These reports also contradicted the promises the Company has made from the time

16  of its IPO that investing in LendingClub meant investing in the Company's technology platform

17  and role as a middleman; now, it was revealed that investing in LendingClub meant investing in

18  (and being directly exposed to) some of the loans it makes.   As the Financial Times explained,

19        The bigger question is what kind of company is Lending Club after all of this. It's

20        apparently not so wedded to the idea of being a pure marketplace, so it's just
          another nonbank lender with ethical lapses, an unstable funding base and a reliance

21        on direct mail marketing to drive customer acquisition. Somewhat of a less
          exciting dream than the one sold when the company floated at $15 in December

22        2014.

23         11.     Investors were shocked by these revelations.   LendingClub stock closed at

24  $7.10 per share on May 6, 2016, then fell to a low of $4.54 on May 9, 2016, ultimately closing at

25  $3.51 on May 13, 2016.   This over 50% drop represented a loss of over $1.3 billion in market

26  value.

27         12.     On May 16, 2016, LendingClub admitted that since at least March 31, 2016, the

28  Company's financial controls environment and its "tone at the top" were deficient in three

    VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT          - 4 -

1  primary areas: (1) sales of near-prime loans; (2) review of related party transactions; and (3) a

2  lack of transparent communication and appropriate oversight of investor contract amendments.

3      13.    On May 16, 2016, LendingClub disclosed that it received a grand jury subpoena

4  from the U.S. Department of Justice.  LendingClub said it was "fully cooperating" with the

5  investigation, and that it had also proactively contacted the SEC.

6      14.    LendingClub stock now trades at less than $5.00 per share, representing a

7  significant decline from its IPO price of $15.00.

8      15.    As a result of the Individual Defendants' misconduct, LendingClub has been and

9  will continue to be harmed.

10      16.    The Board has not commenced, and will not commence, litigation against the

11  Individual Defendants named in this Complaint, let alone vigorously prosecute such claims,

12  because they face a substantial likelihood of liability to the Company for authorizing or failing to

13  correct the false and misleading statements alleged herein, and for failing to correct and/or

14  implement the necessary internal controls to prevent the harm to the Company that has occurred.

15  Accordingly, a pre-suit demand upon the Board is a useless and futile act.  Plaintiff therefore

16  rightfully brings this action to vindicate the Company's rights against its wayward fiduciaries and

17  hold them responsible for the damages they have caused to LendingClub.

18                          **JURISDICTION AND VENUE**

19      17.    The Court has jurisdiction over all claims under 28 U.S.C. § 1331 in that the

20  Complaint states a federal question.  The Court has supplemental jurisdiction over the state law

21  claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive action

22  designed to confer jurisdiction on a court of the United States that it would not otherwise have.

23      18.    The Court has jurisdiction over each defendant because each defendant is either a

24  corporation that does sufficient business in California, or is an individual who has sufficient

25  minimum contacts with California so as to render the exercise of jurisdiction by the California

26  courts permissible under traditional notions of fair play and substantial justice.

27      19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because many of the

28  acts and practices complained of herein occurred in this District.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT          - 5 -

20.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## PARTIES

21.     Plaintiff purchased shares of LendingClub stock on December 11, 2014, and is and at all relevant times has been a holder of LendingClub common stock.

22.     Nominal Defendant LendingClub is incorporated in Delaware, and the Company's principal place of business is located at 71 Stevenson Street, Suite 300, San Francisco, California 94105.  The Company's common stock is traded on the New York Stock Exchange under the ticker symbol "LC."  The Company has more than 381 million shares outstanding.

23.     Defendant Laplanche served as Chairman and CEO of the Company until May 9, 2016, when he abruptly resigned following an internal review by the Company's Board of Directors.   Laplanche is a defendant in the Securities Class Actions.   Laplanche received $1,010,685 in total compensation from the Company in 2015, $11,630,039 in total compensation in 2014, and $518,208 in total compensation in 2013.

24.     Defendant Carrie L. Dolan ("Dolan") has been the Company's Chief Financial Officer since August 2010.   Dolan is a defendant in the Securities Class Actions.   Dolan received$561,000 in total compensation from the Company in 2015, $3,164,891 in total compensation in 2014, and $466,849 in total compensation in 2013.  During the Relevant Period, while in possession of material, non-public information, Dolan sold or caused to be sold at least 135,000 personally held shares of LendingClub stock at artificially inflated prices for proceeds of over $1.8 million.   Dolan's sales were timed to maximize profits from the Company's then artificially inflated stock price.

25.     Defendant Scott Sanborn ("Sanborn") has been the Company's Chief Operating and Marketing Officer from April 2013 to April 2016, when he became President of the Company.   After Laplanche's sudden resignation in May 2016, Sanborn also became the Company's acting CEO.  Sanborn received $768,500 in total compensation from the Company in

2015, and $6,033,773 in total compensation in 2014, including almost $5.4 million in stock. During the Relevant Period, while in possession of material, non-public information, Sanborn sold or caused to be sold at least 245,000 personally held shares of LendingClub stock at artificially inflated prices for proceeds of over $3 million.   Sanborn's sales were timed to maximize profits from the Company's then artificially inflated stock price.

26.   Defendant Daniel T. Ciporin ("Ciporin") has been a director of the Company since 2007.  Ciporin received $240,009 in total compensation from LendingClub for the year ended December 31, 2015.  During the Relevant Period, Ciporin was a member of the Compensation Committee and Risk Committee.  Ciporin is a defendant in the State Securities Class Actions.  In addition, Ciporin is a general partner at the venture capital firm Canaan Partners, which is an affiliate and/or parent of entities which held significant amounts of the Company's stock, including Canaan VII L.P. and Canaan Management, Inc.   As of March 31, 2015, Canaan VII L.P. beneficially owned 45,650,512 shares of LendingClub stock, which represented 12.3% of the Company's outstanding shares.   As of March 31, 2016, Canaan Management, Inc. beneficially owned 25,933,675 shares of LendingClub stock, which represented 6.8% of the Company's outstanding shares.  During the Relevant Period, while in possession of material, non-public information, Ciporin sold or caused to be sold at least 2,700 personally held shares of LendingClub stock at artificially inflated prices for proceeds of over $40,000.   Moreover, by virtue of his position with Canaan Partners, an affiliate and/or parent of Canaan VII L.P. and Canaan Management, Inc., Ciporin controlled the insider sales by these entities for proceeds of more than $51 million.  Ciporin's sales as well as the sales of the Canaan entities he controlled were timed to maximize profits from the Company's then artificially inflated stock price.

27.   Defendant Jeffrey Crowe ("Crowe") has been a director of the Company since August 2007.   During the Relevant Period, Crowe was and remains a member of the Audit Committee and the chairperson of the Compensation Committee.   Crowe is a defendant in the State Securities Class Actions.  During the Relevant Period, while in possession of material, non-public information, Crowe sold or caused to be sold at least 7,023 personally held shares of

1  LendingClub stock at artificially inflated prices for proceeds of approximately $95,723.  Crowe's

2  sales were timed to maximize profits from the Company's then artificially inflated stock price.

3           28.     Defendant Rebecca Lynn ("Lynn") was a director of the Company from March

4  2009 through June 10, 2015.  During the Relevant Period, Lynn was a member of the Audit

5  Committee and the Compensation Committee.  Lynn is a defendant in the State Securities Class

6  Actions.  During the Relevant Period, while in possession of material, non-public information,

7  Lynn sold or caused to be sold at least 450,000 personally held shares of LendingClub stock at

8  artificially inflated prices for proceeds of over $7.6 million.  Lynn's sales were timed to maximize

9  profits from the Company's then artificially inflated stock price.

10          29.     Defendant Mack has been a director of the Company since April 2012.  During the

11 Relevant Period, Mack was and remains a member of the Compensation Committee and the

12 chairperson of the Nominating and Corporate Governance Committee.  Mack is a defendant in the

13 State Securities Class Actions.

14          30.     Defendant Mary Meeker ("Meeker") has been a director of the Company since

15 June 2012.  During the Relevant Period, Meeker was and remains a member of the Nominating

16 and Corporate Governance Committee.   Meeker is a defendant in the State Securities Class

17 Actions.  During the Relevant Period, while in possession of material, non-public information,

18 Meeker sold or caused to be sold at least 2.3 million personally held shares of LendingClub stock

19 at artificially inflated prices for proceeds of approximately $34.5 million.  Meeker's sales were

20 timed to maximize profits from the Company's then artificially inflated stock price.

21          31.     Defendant John C. "Hans" Morris ("Morris") has been a director of the Company

22 since February 2013 and assumed the role of executive Chairman after Laplanche's resignation in

23 2016.  During the Relevant Period, Morris was a member of the Audit Committee but is no longer

24 so.  During the Relevant Period, Morris was and remains the chairperson of the Risk Committee.

25 Morris is a defendant in the State Securities Class Actions.

26          32.     Defendant Lawrence H. Summers ("Summers") has been a director of the

27 Company since December 2012.  During the Relevant Period, Summers was and remains a

28 member of the Nominating and Governance Committee and a member of the Risk Committee.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                   - 8 -

Summers is a defendant in the State Securities Class Actions.  During the Relevant Period, while in possession of material, non-public information, Summers sold or caused to be sold at least 123,284 personally held shares of LendingClub stock at artificially inflated prices for proceeds of over $1.6 million.  Summers's sales were timed to maximize profits from the Company's then artificially inflated stock price.

33.  Defendant Simon Williams ("Williams") has been a director of the Company since November 2014, and previously served as a director of the Company from November 2010 through October 2011.  Williams received $3,920,937 in compensation from the Company in 2015.  During the Relevant Period, Williams was and remains the chairperson of the Audit Committee and a member of the Risk Committee.  Williams is a defendant in the State Securities Class Actions.

34.  Defendants Ciporin, Crowe, Lynn, Mack, Meeker, Morris, Summers, and Williams are collectively referred to herein as the "Director Defendants."

35.  Defendants Dolan, Sanborn, Ciporin, Crowe, Lynn, Meeker, and Summers are collectively referred to herein as the "Insider Selling Defendants."

36.  Defendants Crowe, Morris, and Williams are sometimes referred to herein as the "Audit Committee Defendants."

37.  Defendants Ciporin, Morris, Summers, and Williams are sometimes referred to herein as the "Risk Committee Defendants."

## SUBSTANTIVE ALLEGATIONS[1]

38.  Defendant LendingClub purports to connect borrowers with investors.  The Company describes itself as "the world's largest online marketplace connecting borrowers and investors."  The Company aims to use technology to create efficient mechanisms to allocate capital between borrowers and investors, thereby reducing the need for physical infrastructure, improving convenience and automation, which in turn increases efficiency, reduces manual processes, and improves borrower and investor experiences.

---

[1] Emphasis added unless otherwise stated.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 9

39.     As of December 31, 2015, the Company claimed its marketplace had facilitated approximately $16.0 billion in loans since it first launched in 2007.

40.     The Company offers three principal channels for investors to invest in loans: (1) notes issued pursuant to a shelf registration statement; (2) certificates issued by an independent trust; and (3) whole loan sales.

41.     The Company claims it generates revenue from: (i) transaction fees from the Company's role in accepting and decisioning applications for bank partners to enable originations; (ii) servicing fees from investors for matching available loan assets with capital; and (iii) management fees from investment funds and other managed accounts.

42.     LendingClub's issuing bank partners originate loans to borrowers that apply on its website and the Company then purchases a majority of these loans, with funds provided by investors, through a variety of investment channels, thereby enabling investors to capture the interest rate return on each loan.

43.     On or about August 27, 2014, LendingClub filed a registration statement on Form S-1 with the SEC in connection with the Company's IPO.  The registration statement was subsequently amended several times, with the final amended registration statement filed on Form S-1/A with the SEC on December 8, 2014 (collectively, the "Registration Statement"). Defendants Laplanche, Dolan, Ciporin, Crowe, Lynn, Mack, Meeker, Morris, and Summers each signed the Registration Statement.

44.     The Registration Statement contained a preliminary prospectus.   The final prospectus (the "Prospectus") was filed with the SEC on December 11, 2014.  On December 11, 2014, the SEC declared the Registration Statement effective as of December 10, 2014.

45.     The Registration Statement touted LendingClub's ability to provide its borrower customers with "affordable credit":

> *Access to Affordable Credit*. Our innovative marketplace model, online delivery and process automation enable us to offer borrowers interest rates that are generally lower on average than the rates charged by traditional banks on credit cards or installment loans. Based on responses from 21,051 borrowers in a survey of 103,439 randomly selected borrowers conducted by us during the nine months ended September 30, 2014, borrowers who received a loan to consolidate existing debt or pay off their credit card balance reported that the interest rate on the loan

they received through our marketplace was on average 680 basis points lower than the rate on their outstanding debt or credit card balances, representing a 32% savings.

46.     The Registration Statement included a letter from founder and former CEO and Chairman Defendant Laplanche, further emphasizing the importance of extending "affordable capital" to consumers:

It all started in the summer of 2006 when I opened a credit card statement charging me a 16.99% interest rate, and a savings account statement from the same bank where I was earning a 0.48% interest rate on my deposits. The extreme difference between these two rates – one paid by me to the bank and the other paid by the bank to me – made me wonder whether the existing banking system was indeed the most efficient mechanism to allocate capital from savers and depositors into the hands of people and businesses looking for affordable credit.  At that point, I considered the idea that an online marketplace could be a far more cost-efficient solution. Now, with a seven-year track record and billions of dollars of credit extended, we have clear evidence that our platform delivers extraordinary value and a considerably better experience to borrowers and investors than traditional banks.

Affordable capital provides more financial flexibility to consumers and gives small businesses an opportunity to drive growth and create jobs. Our model furthermore lowers systemic risk, because our marketplace has at all times a perfect match of assets and liabilities: loans and investments are in equal amount and identical terms at any point in time.

…

We offer responsible credit products with a fixed rate, fixed monthly payment, no prepayment penalty and no hidden fees, at a lower interest rate than prevailing alternatives, and disclose all terms upfront in a manner that is easy for borrowers to understand.

47.     The Registration Statement emphasized LendingClub's ability to quickly determine the appropriate interest rate to assign to a prospective borrower:

*Fast and Efficient Decisioning.* We leverage online data and technology to quickly assess risk, determine a credit rating and assign appropriate interest rates. Qualified applicants receive offers in just minutes and can evaluate loan options without impacting their credit score.

. . .

*Attractive Risk-Adjusted Returns*. We have historically offered investors attractive risk-adjusted returns across all loan grades offered through our marketplace. We screen loan applicants based on proprietary credit decisioning and scoring models and also factor in historical borrower performance in setting interest rates.

48.     The Registration Statement also stressed the Company's ability to provide an attractive return tied directly to the interest rates on the securitized loans:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                              - 11 -

We utilize credit decisioning and scoring models that assign each loan offered on our marketplace a corresponding interest rate and origination fee. Our investors' returns are a function of the assigned interest rates for each particular loan invested in less any defaults over the term of the applicable loan.

49.      The Registration Statement contained a partial disclosure regarding the Company's regulatory environment:

**Regulatory Environment**

The regulatory environment for credit is complex and evolving, creating both challenges and opportunities that could affect our financial performance. We expect to continue to spend significant resources to comply with various federal and state laws and various licensing requirements designed to, among other things, protect borrowers (such as truth in lending, equal credit opportunity, fair credit reporting and fair debt collections practices) and investors. Our marketplace incorporates a number of automated features to help comply with these laws in an efficient and cost effective manner. While new laws and regulations or changes under existing laws and regulations could make facilitating loans or investment opportunities more difficult to achieve on acceptable terms, or at all, these events could also provide new product and market opportunities. To the extent we seek to grow internationally, we would become subject to additional foreign regulation and related compliance requirements and expense.

50.      The Registration Statement also disclosed a limited risk related to state usury laws:

***If our marketplace was found to violate a state's usury laws, we may have to alter our business model and our business could be harmed.***

The interest rates that are charged to borrowers and that form the basis of payments to investors through our marketplace are based upon the ability under federal law of the issuing bank that originates the loan to export the interest rates of its jurisdiction of incorporation to provide uniform rates to all borrowers in all states that have not opted out. WebBank, our primary issuing bank, exports the interest rates of Utah, which allows parties to generally agree by contract to any interest rate. The current annual percentage rate offered by WebBank though our marketplace for personal loans range from 6.78% to 29.99%, which equate to interest rates for notes that range from approximately 6.03% to 26.06%. Of the forty-six jurisdictions whose residents may obtain loans (including the District of Columbia), certain states, including Utah, have no statutory interest rate limitations on personal loans, while other jurisdictions have a maximum rate less than the current maximum rate offered by WebBank through our platform. If a borrower were to successfully bring claims against us for state usury law violations, and the rate on that borrower's personal loan was greater than that allowed under applicable state law, we could be subject to fines and penalties. Further, if we were unable to partner with another issuing bank, we would have to substantially modify our business operations from the manner currently contemplated and would be required to maintain state-specific licenses and only provide a limited range of interest rates for personal loans, all of which would substantially reduce our operating efficiency and attractiveness to investors and possibly result in a decline in our operating results.

. . .

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                              - 12 -

*Consumer Protection Laws*

*State Usury Limitations.* Section 521 of the Depository Institution Deregulation and Monetary Control Act of 1980 (DIDA) and Section 85 of the National Bank Act (NBA), federal case law interpreting the NBA such as Tiffany v. National Bank of Missouri and Marquette National Bank of Minneapolis v. First Omaha Service Corporation and FDIC advisory opinion 92-47 permit FDIC-insured depository institutions, such as WebBank, to "export" the interest rate permitted under the laws of the state or U.S. territory where the bank is located, regardless of the usury limitations imposed by the state law of the borrower's residence unless the state has chosen to opt out of the exportation regime. WebBank is located in Utah, and Title 70C of the Utah Code does not limit the amount of fees or interest that may be charged by WebBank on loans of the type offered through our marketplace. Only Iowa and Puerto Rico have opted out of the exportation regime under Section 525 of DIDA and we do not operate in either jurisdiction. We believe, however, if a state or U.S. territory in which we operate opted out of rate exportation, judicial interpretations support the view that such opt outs would apply only to loans "made" in those states. We believe that the "opt-out" of any state would not affect the ability of our marketplace to benefit from the exportation of rates. If a loan made through our marketplace were deemed to be subject to the usury laws of a state or U.S. territory that had opted-out of the exportation regime, we could become subject to fines, penalties and possible forfeiture of amounts charged to borrowers, and we could decide not to originate loans in that jurisdiction, which could adversely impact our growth.

51.     The above statements made in the Registration Statement were materially false and misleading when made because the Company failed to disclose the following material facts: (i) LendingClub had an unsustainable business model that was predicated on it being able to issue loans with extremely high and/or usurious rates across the country; (ii) LendingClub's loan investors would not be able to enforce the extremely high and/or usurious rates imposed by LendingClub because they violated state usury laws; (iii) without the extremely high and/or usurious rates, the loans generated through LendingClub's marketplace would not be attractive to investors because the loans had very high credit risk and were subject to issues concerning insufficient documentation; (iv) a substantial portion of LendingClub's loans were issued with rates in excess of those allowed by applicable state usury laws; and (v) LendingClub is not a "pure marketplace" and instead has direct exposure to some of the loans it makes.

52.     On December 8, 2014, LendingClub filed its Prospectus with the SEC, which forms part of the Registration Statement.  In the Prospectus, the Company stated, in relevant part:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 13 -

**Our Strategy for Growth**

Our historical growth rates reflect a deliberate strategy of balancing loan originations in a manner that allowed us to build and develop the various enterprise functions to support our scale, including customer support, operations, risk controls, compliance and technology. Borrower and investor demand will continue to inform our business and loan product decisions, but *we will not compromise the long-term viability of our marketplace to pursue excessive near-term growth rates that we believe would result in borrower or investor experiences below our standards.*

. . .

For consumers and small business borrowers, we leverage our cost advantages and marketplace model to provide borrowers with affordable credit. We utilize our technology to provide a better experience, offering borrowers a convenient, simple and fast online application that improves the often time-consuming and frustrating loan application process. *We design our products to be fair, transparent and borrower friendly*. All of the loans offered through our marketplace feature fixed rates, fixed monthly payments, no hidden fees and no prepayment penalties.

For individual and institutional investors, we deliver value by providing them with the opportunity to earn attractive risk-adjusted returns through equal access to standard program loans offered through our marketplace. *Our marketplace provides investors with the transparency and flexibility to quickly and easily tailor or modify their portfolio by utilizing specific investment criteria, such as credit attributes, financial data and loan characteristics.* We use proprietary credit decisioning and scoring models and extensive historical loan performance data to provide investors with tools to construct loan portfolios confidently and model targeted returns. . . . Our technology-powered marketplace enables broad diversification by allowing investors to invest in individual loans in increments as low as $25.

. . .

**Industry Background and Trends**

There is an opportunity for the online marketplace model to transform the traditional banking system. We believe *a transparent and open marketplace* where borrowers and investors have access to information, complemented by technology and tools, can make credit more affordable, redirect existing pools of capital trapped inside the banking system and attract new sources of capital to a new asset class. We believe online marketplaces have the power to facilitate more efficient deployment of capital and improve the global economy.

. . .

**Benefits to Borrowers**

. . .

*Transparency and Fairness.* All of the installment loans offered through our marketplace feature a fixed rate that is clearly disclosed to the borrower during the application process, with fixed monthly payments, no hidden fees and the ability to prepay the balance at any time without penalty. Our platform utilizes a

computerized, rules-based engine for credit decisioning, which removes the human bias associated with reviewing applications.

. . .

**Benefits to Investors**

. . .

*Transparency.* We provide investors with transparency and choice in building their loan portfolios. For each standard program loan, investors can examine credit attributes from the borrower's credit report and borrower-reported attributes prior to investing in a loan and can monitor ongoing loan performance. We also provide access to credit profile data on each approved loan as well as all of the historical performance data for every loan ever invested in through our marketplace. We specifically indicate the information that is verified on our website.

53.     The Prospectus also contained a Letter from Renaud Laplanche, in which Laplanche stated, in part:

I believe we can transform the current banking system into a frictionless, transparent and highly efficient online marketplace that provides affordable credit to borrowers and creates great investment opportunities for investors, helping millions of people achieve their financial goals.

. . .

**Building Confidence**

We are not only bringing cost efficiency to the credit markets but also a more transparent and customer-friendly experience. Unlike traditional banks, we do not build confidence by establishing a branch at every street corner. Instead, *we earn the trust of our customers by offering maximum transparency into our products' terms and performance.*

. . .

*We have established investor confidence* by demonstrating the effectiveness of our risk ranking technology, as well as *through the accuracy, transparency and granularity of our reporting.* We post on our platform the detailed performance of every single loan offered publicly to investors since inception, along with more aggregated performance statistics.

We are continuing to earn investor confidence every day by providing equal access and with a level playing field with the same tools, data and access for all investors, small and large, within a fair and efficient marketplace.

54.     On December 11, 2014, LendingClub completed its IPO, selling 58 million shares at $15.00 each and raising $870 million.  On its first day of trading, LendingClub's stock price

1  climbed as high as $25.44 per share, ultimately closing at $23.43 per share, up more than 56%
2  from its IPO price.   The Company sold 50.3 million shares at $15.00 per share, selling
3  shareholders sold another 7.7 million shares, and the underwriters of the Offering exercised their
4  option to purchase an additional 8.7 million shares, bringing the total number of shares sold to
5  66.7 million.

6  55.   On December 18, 2014, one week after the IPO, LendingClub's stock closed at a
7  Relevant Period high of $26.94 per share.

8  56.   On February 27, 2015, LendingClub filed an Annual Report on Form 10-K with
9  the SEC announcing the Company's financial and operating results for the quarter and year ended
10  December 31, 2014 (the "2014 10-K").   For the quarter, LendingClub reported a net loss of
11  $9.04 million, or $0.07 per diluted share, on net revenue of $68.12 million, compared to net
12  income of $2.86 million, or $0.02 per diluted share, on net revenue of $33.50 million for the same
13  period in the prior year.   For 2014, LendingClub reported a net loss of $32.89 million, or
14  $0.44 per diluted share, on net revenue of $211.25 million, compared to net income of
15  $7.31 million, or zero per diluted share, on net revenue of $98.04 million for 2013.

16  57.   In the 2014 10-K, LendingClub stated, in part:

17
18  Online marketplaces have emerged to connect buyers and sellers across many
industries to increase choice, improve quality, accelerate the speed of decision
making and lower costs. ***We believe a successful online marketplace must act as
a trusted intermediary providing transparency***, security, supply and demand
19  balance and ease of use to give marketplace participants an incentive to interact
20  and the confidence to do business together. Initial online marketplaces connected
buyers and sellers of goods and services—primarily moving demand from offline
21  to online and making the transaction process more efficient. Online marketplaces
22  have more recently evolved to unlock supply and demand that could not previously
be matched in an efficient manner offline. The "sharing economy," a term that
23  describes this new marketplace trend, enables a better use of resources by allowing
owners of underutilized assets to offer them to people who want them while
24  capturing an economic benefit.

25  **Our Solution**

26  We are the world's largest online marketplace connecting borrowers and investors.
Our technology platform supports this innovative marketplace model to efficiently
27  connect the supply and demand of capital. Our marketplace also substantially
28  reduces the need for physical infrastructure and improves convenience and

automation, increasing efficiency, reducing manual processes and improving the overall borrower and investor experience.

We believe that our marketplace provides the following benefits to borrowers:

. . .

- **Transparency and Fairness.** All of the installment loans offered through our marketplace feature a fixed rate that is clearly disclosed to the borrower during the application process, with fixed monthly payments, no hidden fees and the ability to prepay the balance at any time without penalty. Our platform utilizes a computerized, rules-based engine for credit decisioning, which removes the human bias associated with reviewing applications.

. . .

We believe that our marketplace provides the following benefits to investors:

. . .

- **Transparency.** We provide investors with transparency and choice in building their loan portfolios.

58.    The 2014 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Laplanche and Dolan, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.  The 2014 10-K was also signed by each of the Director Defendants.

59.    On March 10, 2015, Defendant Laplanche gave an interview with the online publication *LendingMemo*, in which he assured the marketplace that the Company had not put its customers at risk in pursuit of growth:

[Interviewer:] Lending Club continues to lead the online lending industry. Last year you hired several hundred new employees, took over four more floors in your building, and issued an incredible $4.4 billion in new loans. Growth is near a half billion dollars of new loans per month. How are you doing this?

[Laplanche:] We continue to be very deliberate about our growth. . . . One thing we are acutely aware of is to make sure we don't grow too fast, causing operational mistakes. *We are dealing with people's money, so it puts additional responsibility on us to manage growth in a way that doesn't put our customers at risk.*

60.    On May 5, 2015, LendingClub filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 17 -

1   2015 (the "Q1 2015 10-Q").  For the quarter, LendingClub reported a net loss of $6.37 million, or

2   $0.02 per diluted share, on net revenue of $81.24 million, compared to a net loss of $7.30 million,

3   or $0.13 per diluted share, on net revenue of $38.72 million for the same period in the prior year.

4       61.     In the Q1 2015 10-Q, LendingClub stated, in part, that the Company's "trusted

5   brand, scale and network effect drives significant borrowing and investing activity on our

6   marketplace."

7       62.     The Q1 2015 10-Q contained signed certifications pursuant to SOX by Laplanche

8   and Dolan, stating that the financial information contained in the Q1 2015 10-Q was accurate and

9   disclosed any material changes to the Company's internal control over financial reporting.

10      63.     On May 22, 2015, the Second Circuit revealed the weakness of the business model

11   used by LendingClub when it held that loans sold by banks to non-banks and third-parties (such

12   as LendingClub and its investors) are not exempt from state usury laws that limit interest rates.

13   *See Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015), *petition for cert*, *docketed*,

14   *Midland Funding, LLC v. Madden*, No. 15-610 (U.S. Nov. 10, 2015) (the "*Madden* Decision).

15   Specifically, the Second Circuit observed that assignees and third-party debt buyers could not rely

16   on the National Bank Act to export interest rates that were legal in one state, but usurious in

17   another, to the states where those rates were impermissible.  The Second Circuit further explained

18   that the National Bank Act generally does not apply to third-parties unless the third -party is

19   acting on behalf of a bank in carrying out the bank's business.  Thus, if state usury laws apply to

20   third-party purchasers of debt including individual and institutional investors who buy

21   LendingClub's notes and certificates (from WebBank), loans with interest rates exceeding the

22   limits of a borrower may not be fully collectable—or potentially collectable at all.

23      64.     In the wake of the *Madden* Decision, investors and analysts expressed concerns

24   about the impact of the decision on LendingClub.  According to Moody's analysts Alan Birnbaum

25   and Matias Langer, "[i]f interpreted broadly, interest rates on some loans backing marketplace

26   lending [asset-backed securities] transactions could be reduced, or the loans themselves be void."

27   Morgan Stanley reported that some buyer of the notes that the Company had spoken to had been

28   proactively avoiding notes above state usury limits.  Gilles Gade, CEO of Cross River Bank,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT            - 18 -

1    stated to Bloomberg Business that "[s]ome investors have warned they may simply shun loans to

2    borrowers in certain states, because they either don't yield as much or could be affected by the

3    decision."

4           65.    On August 5, 2015, LendingClub filed a Quarterly Report on Form 10-Q with the

5    SEC announcing the Company's financial and operating results for the quarter ended June 30,

6    2015 (the "Q2 2015 10-Q").  For the quarter, LendingClub reported a net loss of $4.14 million, or

7    $0.01 per diluted share, on net revenue of $96.92 million, compared to a net loss of $9.19 million,

8    or $0.16 per diluted share, on net revenue of $48.23 million for the same period in the prior year.

9           66.    In the Q2 2015 10-Q, LendingClub stated, in part, that the Company's "***trusted***

10    ***brand***, scale and network effect drives significant borrowing and investing activity on our

11    marketplace."

12           67.    The Q2 2015 10-Q contained signed certifications pursuant to SOX by Laplanche

13    and Dolan, stating that the financial information contained in the Q2 2015 10-Q was accurate and

14    disclosed any material changes to the Company's internal control over financial reporting.

15           68.    On August 8, 2015, the Company hosted an investor conference call to discuss

16    LendingClub's financial results for the second quarter of 2015.  During the call, after Laplance

17    revealed that 12.5% of the Company's loan volume exceeded statutory interest caps in various

18    states, analysts raised concerns about the *Madden* Decision.

19           69.    Based on statements by Defendants, which indicated that a significant percentage

20    of the Company's loan portfolio was violating state usury laws under *Madden*, the following

21    exchange took place on the August 8, 2015 conference call:

22         Next let me say a few words about the regulatory framework we operate in.

23         Our marketplace benefits from what we believe to be an efficient regulatory
            framework that offers borrowers the same level of consumer protection that benefit
24         from a bank while providing us with more flexibility and the more cost efficient
            and capital-light framework.  In particular, all loans are overseen, issued and
25         originated by federally regulated banks and often our lending regulation which has
            truth in lending and fair lending and fair credit reporting are applicable.  We
26         believe that one of the benefits of our platform is to use technology to make
            consumer protection more effective and more efficient.

27

28         As an alternative to our partnerships with issuing banks, and other framework
         available to us is a direct lending approach by utilizing state licenses. Under a state

license framework, however, interest rates would be limited by state specific interest rate caps.  And based on our current mix, we estimate that roughly 12.5% of our platform's loan volume would exceed the interest rate caps in certain states.

Another key aspect of our regulatory framework is that we do not collect deposits like a bank would.  Instead we sell securities or whole loans to investors and these securities are matched in terms of rate and duration with the underlying loans. *Lending Club does not assume credit risk or interest rate risk which are borne by investors.* Therefore, there is no capital requirement or FDIC insurance.

. . .

Analyst:

And do you have any comments on the Madden v. Midland funding case that's going through the court system right now in terms of how it potentially impacts your business?

Laplanche:

Yes, so we've seen that case that came out a couple of months ago. I think the – our take there is obviously the particular circumstances of the case are different from what we're seeing on our platform. But in general what really helps us apply Utah low to most of our loans is really a couple of things. One is for the all preemption. And the second is choice of law provision in our contract. The Madden case really challenged the federal preemption but did not challenge the choice of low provision, so that's really the -- and we don't need both, we need one of them. So we continue to operate in the second [separate] district where that decision was rendered exactly as we did before and are relying on our choice of provisions.

Note that this particular case is getting challenged by a lot of players in the banking industry, including the American Banking Association. And I think it's an unusual case, but certainly that doesn't come back to us in that the sense that we continue to rely on choice of law provision.

If we were to see that the choice of law provision was getting challenged elsewhere, which there's no reason to expect at this point, we could also think of a different issuance framework than the one we're using now where we would switch to a series of state licenses. *And that's in (inaudible) we provided in our slide deck that shows that using the current mix we have about 12.5% of our loans that would exceed the state interest rate caps.*

*So that certainly would be (inaudible) demand and we'd have to revise our pricing in certain states, but that certainly would be another option available to us if our choice of law provision and federal preemption was getting challenged in other states.*

70.    On November 3, 2015, LendingClub filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").  For the quarter, LendingClub reported net income of $0.95 million, or zero per diluted share, on net revenue of $116.28 million, compared to a net loss

of $7.37 million, or $0.12 per diluted share, on net revenue of $56.07 million for the same period in the prior year.

71.     In the Q3 2015 10-Q, LendingClub stated, in part, that the Company's "***trusted brand***, scale and network effect drives significant borrowing and investing activity on our marketplace."

72.     The Q3 2015 10-Q contained signed certifications pursuant to SOX by Laplanche and Dolan, stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

73.     On December 2, 2015, Defendant Laplanche spoke on behalf of the Company at the Credit Suisse Technology, Media & Telecom Conference, during which he made the following statements:

Analyst:

Yes. I think there's also regulatory concerns around the business right now. And, in particular, the one that comes up the most is the ruling on Madden. Can you explain, or at least remind us, what that entails?  And I guess starting from there, and how that might impact your business.

Laplanche:

Yes. The *Madden* case was a Court of Appeals decision from the Second Circuit Court of Appeals, so that concerns New York, Vermont, and Connecticut. And it was a case where a bank—it was Bank of America—made a loan to a borrower in New York, and then subsequently sold that loan to a collection agency that sent a notice to the customers saying, hey, now your loan is subject to the law of Delaware, and we're going to collect using the maximum available rate in the state of Delaware.

What the Court said is when the bank sells the loan to the collection agency, the loan stops getting the benefit of the National Bank Act, and the state's maximum rate would then apply. Which was a departure from any other case before that, and from a lot of cases that came after that, as well, in other Circuits. That case is snaking its way through the court system. There's Midland, which is the other party, is trying to get the Supreme Court to pick it up. We don't know yet if that's going to happen.

In the meantime, I think so far there's been no impact to our business. I think the circumstances, the facts, are very different. We think we have a much better situation. We don't change the law applicable to the contract at any point in time. The applicable law remains in the state of Utah for the life of the loan. ***But as an additional precaution, we made some changes to our relationship with our issuing bank to stake sure that even if the Madden criteria were to be applied to us, we would still be able to operate as we have before, and not he subject to state-specific regulations.***

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                        - 21 -

Analyst:

Yes. I can go on your Investor Relations site now and download all of the historical loans data, deep data explicitly there, and you can overlay that with the maximum interest rate allowances on a state-by-state basis. And if I were to sit there and say, okay, Lending Club, you can't do loans above a certain interest rate anymore—it seems like if you do that analysis, it's about 11% or so of the total loan volume out there (multiple speakers)?

Laplanche:

That's right.  If you take a worst-case scenario analysis and say, okay, let's assume that case becomes the national jurisprudence and it is expanded nationwide. The facts, again, we believe are different, but let's assume we are . . . *The worst-case scenario happens, and the Madden case were to be applied to us, we'd have about 12.5% of our loans that are in excess of to state limit, which of doesn't mean we would lose 12.5% of our volume.  We would have to reprice some of these loans.  There might be a portion of that that can't be priced in a way that makes it attractive to investors, so we might lose a portion of the 12.5%, but that's really a worst-case scenario.*

74.     On February 22, 2016, LendingClub filed an Annual Report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K").  For the quarter, LendingClub reported net income of $4.57 million, or $0.01 per diluted share, on net revenue of $135.52 million, compared to a net loss of $9.04 million, or $0.07 per diluted share, on net revenue of $68.12 for the same period in the prior year.  For 2015, LendingClub reported a net loss of $5 million, or $0.01 per diluted share, on net revenue of $429.94 million, compared to a net loss of $32.89 million, or $0.44 per diluted share, on net revenue of $211.13 million for 2014.

75.     In the 2015 10-K, LendingClub stated, in part:

**Online Marketplaces Have Proliferated Throughout the Economy**

Online marketplaces have emerged to connect buyers and sellers across many industries to increase choice, improve quality, accelerate the speed of decision making and lower costs. *We believe a successful online marketplace must act as a trusted intermediary providing transparency*, security, supply and demand balance, and ease of use to give marketplace participants an incentive to interact and the confidence to do business together. Initial online marketplaces connected buyers and sellers of goods and services – primarily moving demand from offline to online and making the transaction process more efficient. Online marketplaces have more recently evolved to unlock supply and demand that could not previously be matched in an efficient manner offline. The "sharing economy," a term that describes this new marketplace trend, enables a better use of resources by allowing owners of underutilized assets to offer them to people who want them while capturing an economic benefit.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                      - 22 -

**Our Solution**

We believe that our marketplace provides the following benefits to borrowers:

. . .

- **Transparency and Fairness.** The installment loans offered through our marketplace feature a fixed rate that is clearly disclosed to the borrower during the application process, with fixed monthly payments, no hidden fees and the ability to prepay the balance at any time without penalty. Small business lines of credit have rates based upon the prime rate and allow borrowers to draw in increments, reducing their interest cost. Our platform utilizes an automated, rules-based engine for credit decisioning, which removes the human bias associated with reviewing applications.

. . .

We believe that our marketplace provides the following benefits to investors:

. . .

- **Transparency.** We provide investors with transparency and choice in building their loan portfolios.

76. The 2015 10-K contained signed certifications pursuant to SOX by Laplanche and Dolan, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting. The 2015 10-K was also signed by each of the following Defendants: Crowe, Meeker, Morris, and Williams.

77. On April 26, 2016, the Individual Defendants caused LendingClub to file with the SEC and disseminate to shareholders a Proxy Statement on Form DEF 14A (the "Proxy Statement") pursuant to Section 14(a) of the Exchange Act. The Proxy Statement described director responsibilities, the duties of each committee, the Board's purported risk management activities, and provided information about the director nominees up for election. However, the Proxy Statement misrepresented and/or failed to disclose that: (i) LendingClub had an unsustainable business model that was predicated on it being able to issue loans with extremely high and/or usurious rates across the country; (ii) LendingClub's loan investors would not be able to enforce the extremely high and/or usurious rates imposed by LendingClub because they violated state usury laws; (iii) without the extremely high and/or usurious rates, the loans generated through LendingClub's marketplace would not be attractive to investors because the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 23 -

loans had very high credit risk and were subject to issues concerning insufficient documentation; (iv) a substantial portion of LendingClub's loans were issued with rates in excess of those allowed by applicable state usury laws; (v) LendingClub's internal controls were inadequate to ensure that the Company's loans conformed to its customers' criteria; (vi) LendingClub's internal controls were inadequate to ensure that relevant interests in third-party transactions were fully and timely disclosed; (vii) LendingClub is not a "pure marketplace" and instead has direct exposure to some of the loans it makes; and (viii) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### REASONS STATEMENTS WERE IMPROPER

78.     The statements referenced above were each materially false and misleading when made because they misrepresented or failed to disclose the following adverse facts, which were known or recklessly disregarded by the Individual Defendants, but were concealed from the investing public:

(a)     LendingClub had an unsustainable business model that was predicated on it being able to issue loans with extremely high and/or usurious rates across the country;

(b)     LendingClub's loan investors would not be able to enforce the extremely high and/or usurious rates imposed by LendingClub because they violated state usury laws;

(c)     without the extremely high and/or usurious rates, the loans generated through LendingClub's marketplace would not be attractive to investors because the loans had very high credit risk and were subject to issues concerning insufficient documentation;

(d)     A substantial portion of LendingClub's loans were issued with rates in excess of those allowed by applicable state usury laws;

(e)     LendingClub's internal controls were inadequate to ensure that the Company's loans conformed to its customers' criteria;

(f)     LendingClub's internal controls were inadequate to ensure that relevant interests in third-party transactions were fully and timely disclosed;

(g)     LendingClub is not a "pure marketplace" and instead has direct exposure to some of the loans it makes; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 24 -

1      (h)    As a result of the foregoing, the Company's public statements were materially

2  false and misleading at all relevant times.

3      79.    As a result of the Individual Defendants' false and misleading statements and

4  omissions, LendingClub shares traded at artificially inflated prices during the Relevant Period.

5  Once the true facts regarding the Company's financial prospects and future business prospects

6  began to emerge, the Company's stock price fell dramatically, erasing over a billion dollars in

7  market capitalization.

8                  **THE TRUTH BEGINS TO EMERGE**

9      80.    .On May 9, 2016, LendingClub disclosed in an SEC filing that on May 6, 2016, the

10  Company's board of directors had accepted the resignation of Defendant Laplanche as the

11  Company's Chairman and CEO.   The Company reported that Laplanche's resignation was

12  precipitated by an internal review that found that the Company had sold $22 million in loans,

13  made to consumers with low credit scores, to a single investor (later reported to be Jefferies), in

14  violation of the investor's "express instructions."

15      81.    In the same filing, the Company also disclosed "a failure to inform the board's

16  Risk Committee of personal interests held in a third party fund while the Company was

17  contemplating an investment in the same fund."   Media outlets subsequently reported that

18  Laplanche had failed to fully disclose a personal interest he held in Cirrix Capital while the

19  Company was contemplating investing in the fund—an investment that Laplanche had himself

20  proposed to LendingClub's risk-management committee—and that LendingClub board member

21  John Mack also held an undisclosed interest in Cirrix Capital.  Additionally, LendingClub said its

22  risk committee approved an investment by LendingClub itself into Cirrix Capital—without the

23  knowledge of the prior investment by Laplanche.

24      82.    On this news, LendingClub's stock fell $2.48 per share, or nearly 35%, to close at

25  $4.62 per share on May 9, 2016.

26      83.    Also on May 9, 2016, after the market closed, news outlets reported that the SEC

27  was investigating LendingClub's disclosures.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT          - 25 -

84.     On May 10, 2016, Bloomberg and other news outlets reported that Goldman Sachs and Jefferies had halted their purchases of LendingClub loans.  That same day, the U.S. Treasury Department issued a White Paper describing the online lending industry as "untested" and calling for more regulation.

85.     Also on May 10, 2016, the *Financial Times* published an article entitled, "There are bigger questions for Lending Club to answer."   The article noted that back in January, Defendant Laplanche said his business wasn't interested in taking credit risk.  "To do so would be a betrayal of the company's investors, he suggested.  'The representation we made to our equity investors is that we operate as a marketplace and that we don't take credit risk,' he told [the Financial Times]."  The article further reported,

> Laplanche has been forced out after Lending Club sold loans to Jefferies that it knew didn't fit the investment bank's criteria. According to the WSJ, he initially flagged the loan problem and ordered an investigation, but "the board later determined that he didn't give investigators a complete account of what he knew". That might have been enough for Laplanche to lose his job, but it was also discovered he had failed to disclose a personal interest in a fund that the online lender invested in, which we now know was a buyer of Lending Club loans.

> But there's a bigger issue here than what Laplanche did or didn't disclose. Namely, why was Lending Club investing in a fund that buys Lending Club loans?

86.     The May 10, 2016 *Financial Times* article noted LendingClub "is supposed to be a pure marketplace, which takes no risk on to its balance sheet and merely sells loans through to retail and institutional buyers.  We now discover that the business does indeed have direct exposure to some of the loans that it makes."  The article concluded:

> So by April this year, Lending Club, its chief executive, and a board member together had a 31 per cent stake in an entity that effectively bought some $175m of Lending Club loans in 2015, according to the filing last month. This is the sort of blatant conflict of interest that makes you wonder if there was something in the company's water cooler.

> Apparently the full board, which includes venture capitalist Mary Meeker, was not involved in the decision. Instead it was the risk committee, which includes board member Larry Summers, the former US treasury secretary that approved an investment that contradicts the story Lending Club sold to the public. That might be slightly better, who knows.

> Hans Morris, who was and still is chair of the risk committee, is now tasked with winning back investor trust as executive chairman. The company has suspended forward guidance as it deals with the "material weaknesses" in its financial

controls. The shares are now trading at just $4.66, down almost 60 per cent so far this year.

The bigger question is what kind of company is Lending Club after all of this. It's apparently not so wedded to the idea of being a pure marketplace, so it's just another nonbank lender with ethical lapses, an unstable funding base and a reliance on direct mail marketing to drive customer acquisition. Somewhat of a less exciting dream than the one sold when the company floated at $15 in December 2014.

87.     On May 16, 2016, LendingClub filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q").  In the Q1 2016 10-Q, Defendants caused the Company to disclose that:

The board review also noted that our former CEO and our Chief Financial Officer (CFO) had pledged some of their Company shares to secure personal loans from a third-party financial institution, which was not disclosed to the board during subsequent deliberations, prior to the discussion referred to below.  *In January 2016*, the reduction in the Company's share price forced them to refinance.  *In order to avoid selling shares, the former CEO requested temporary financing, secured by real estate, from an entity related to a director of the Company.*  Separately, the former CEO then offered to lend an amount to the CFO to also permit her to refinance her loan.  *These temporary financing arrangements were discussed with the members of the Audit Committee.  The officers obtained new financing from unrelated third parties within three weeks to pay off their temporary financing arrangements.  In the opinion of the Company these lending arrangements were executed on normal market terms and, because the Company had no financial involvement in them, did not require approval under the Company's policy on related-party transactions.*

88.     On May 27, 2016, in a *Bloomberg* article entitled "LendingClub Founder Turned to John Mack for Emergency Loan Help," it was finally disclosed (albeit, by a third party and not Defendants) that when Laplanche "got into a jam" in January 2016, he turned to fellow Board member and Morgan Stanley CEO Mack "for an old-fashioned version of a peer-to-peer loan." Morgan Stanley later provided a mortgage to Laplanche.  Without this financial bailout by Mack and Morgan Stanley, the article states that Laplanche would have been forced to sell part of his stake in the Company.

89.     The price of LendingClub stock has continued to decline, reaching a low of $3.44 on May 17, 2016.  The stock closed at $4.72 on June 6, 2016, well below its Relevant Period high of $26.94 per share which it hit on December 18, 2014, and more than $10.00 per share below its IPO price of $15.00 per share.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                          - 27 -

**INSIDER SELLING**

90.     As a result of Defendants' materially false and misleading statements and failures to disclose, LendingClub public stock traded at artificially inflated prices during the Relevant Period.

91.     During the Relevant Period, while in possession of material, adverse, non-public information, certain of the Individual Defendants took advantage of the artificially inflated prices to sell their LendingClub shares for substantial proceeds.  Specifically, as detailed below, the Insider Selling Defendants (including Defendants Ciporin, Crowe, Meeker, and Summers, i.e., half of the current Board) sold ***more than $48 million*** of personally held or controlled common stock.

92.     Defendant Dolan was the Company's Chief Financial Officer during the Relevant Period.  Dolan was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of LendingClub's disclosures in the Company's press releases and public filings, including that LendingClub had an unsustainable business model that relied on issuing loans with extremely high rates that violate state usury laws.  While in possession of this information, Dolan sold at least 135,000 personally held shares of LendingClub stock at artificially inflated prices for proceeds of over $1.8 million.  Dolan's sales were timed to maximize profits from the Company's then artificially inflated stock price.

93.     Defendant Sanborn was the Company's Chief Operating and Marketing Officer during the Relevant Period.  Sanborn was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of LendingClub's disclosures in the Company's press releases and public filings, including that LendingClub had an unsustainable business model that relied on issuing loans with extremely high rates that violate state usury laws. While in possession of this information, Sanborn sold at least 245,000 personally held shares of LendingClub stock at artificially inflated prices for proceeds of over $3 million.  Sanborn's sales were timed to maximize profits from the Company's then artificially inflated stock price.

94.     Defendant Ciporin was a member of the Company's Board during the Relevant Period.   Ciporin was aware of material, non-public information regarding the Company's

1    financial reporting, and the inaccuracy of LendingClub's disclosures in the Company's press

2    releases and public filings, including that LendingClub had an unsustainable business model that

3    relied on issuing loans with extremely high rates that violate state usury laws.   While in

4    possession of this information, Ciporin sold at least 2,700 personally held shares of LendingClub

5    stock at artificially inflated prices for proceeds of more than $40,000.  Moreover, by virtue of his

6    position with Canaan Partners, an affiliate and/or parent of Canaan VII L.P. and Canaan

7    Management, Inc., Ciporin controlled the insider sales by these entities for proceeds of more than

8    $51 million.  Ciporin's sales were timed to maximize profits from the Company's then artificially

9    inflated stock price.

10          95.    Defendant Crowe was a member of the Company's Board during the Relevant

11   Period.  Crowe was aware of material, non-public information regarding the Company's financial

12   reporting, and the inaccuracy of LendingClub's disclosures in the Company's press releases and

13   public filings, including that LendingClub had an unsustainable business model that relied on

14   issuing loans with extremely high rates that violate state usury laws.  While in possession of this

15   information, Crowe sold at least 7,023 personally held shares of LendingClub stock at artificially

16   inflated prices for proceeds of approximately $95,723.   Crowe's sales were timed to maximize

17   profits from the Company's then artificially inflated stock price.

18          96.    Defendant Lynn was a member of the Company's Board during the Relevant

19   Period.  Lynn was aware of material, non-public information regarding the Company's financial

20   reporting, and the inaccuracy of LendingClub's disclosures in the Company's press releases and

21   public filings, including that LendingClub had an unsustainable business model that relied on

22   issuing loans with extremely high rates that violate state usury laws.  While in possession of this

23   information, Lynn sold at least 450,000 personally held shares of LendingClub stock at artificially

24   inflated prices for proceeds of over $7.6 million.  Lynn's sales were timed to maximize profits

25   from the Company's then artificially inflated stock price.

26          97.    Defendant Meeker was a member of the Company's Board during the Relevant

27   Period.   Meeker was aware of material, non-public information regarding the Company's

28   financial reporting, and the inaccuracy of LendingClub's disclosures in the Company's press

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 29 -

1   releases and public filings, including that LendingClub had an unsustainable business model that
2   relied on issuing loans with extremely high rates that violate state usury laws.   While in
3   possession of this information, Meeker sold at least 2.3 million personally held shares of
4   LendingClub stock at artificially inflated prices for proceeds of approximately $34.5 million.
5   Meeker's sales were timed to maximize profits from the Company's then artificially inflated stock
6   price.

7       98.    Defendant Summers was a member of the Company's Board during the Relevant
8   Period.   Summers was aware of material, non-public information regarding the Company's
9   financial reporting, and the inaccuracy of LendingClub's disclosures in the Company's press
10  releases and public filings, including that LendingClub had an unsustainable business model that
11  relied on issuing loans with extremely high rates that violate state usury laws.   While in
12  possession of this information, Summers sold at least 123,284 personally held shares of
13  LendingClub stock at artificially inflated prices for proceeds of over $1.6 million.   Summers'
14  sales were timed to maximize profits from the Company's then artificially inflated stock price.

15      99.    These insider sales were executed under highly suspicious circumstances and
16  occurred while the Company's stock price was artificially inflated due to the misrepresentations
17  and omissions alleged herein.   The Insider Selling Defendants' sales during the Relevant Period
18  include the following:

19

| Insider | Title | Date | Shares | Price | Proceeds |
|---------|-------|------|--------|-------|----------|
| Dolan, Carrie | Chief Financial Officer | 3-Nov-2015 | 31,243 | $15.00 | $468,645 |
| | | 14-Dec-2015 | 25,830 | $13.20 | $340,9563 |
| | | 14-Dec-2015 | 77,927 | $13.22 | $1,030,195 |
| | | | **135,000** | | **$1,839,796** |
| | | | | | |
| Sanborn, Scott | Chief Operating and Marketing Officer | 6-Aug-2015 | 35,000 | $13.80 | $483,000 |
| | | 8-Sept-2015 | 35,000 | $12.36 | $432,600 |
| | | 6-Oct-2015 | 35,000 | $13.84 | $484,400 |
| | | 6-Nov-2015 | 35,000 | $14.41 | $504,350 |
| | | 7-Dec-2015 | 35,000 | $13.16 | $460,600 |
| | | 6-Jan-2016 | 70,000 | $10.30 | $721,000 |
| | | | **245,000** | | **$3,085,950** |
| | | | | | |
| Ciporin, Daniel | Director | 3-Nov-2015 | 2,700 | $15.00 | $40,500 |
| | | | **2,700** | | **$40,500** |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                            - 30 -

| Insider | Title | Date | Shares | Price | Proceeds |
|---------|-------|------|--------|-------|----------|
| Crowe, Jeffrey | Director | 14-Aug-2015 | 7,023 | $13.63 | $95,723 |
| | | | **7,023** | | **$95,723** |
| Lynn, Rebecca | Director | 9-Jun-2015 | 450,000 | $16.91 | $7,609,500 |
| | | | **450,000** | | **$7,609,500** |
| Meeker, Mary | Director | 16-Dec-2015 | 2,300,000 | $15.00 | $34,500,000 |
| | | | **2,300,000** | | **$34,500,000** |
| Summers, Lawrence | Director | 30-Sept-2015 | 23,421 | $13.29 | $311,265 |
| | | 5-Oct-2015 | 10,000 | $14.00 | $140,000 |
| | | 15-Oct-2015 | 23,421 | $14.53 | $340,307 |
| | | 03-Nov-2015 | 19,600 | $15.00 | $294,000 |
| | | 16-Nov-2015 | 23,421 | $12.61 | $295,339 |
| | | 15-Dec-2015 | 23,421 | $12.62 | $295,573 |
| | | | **123,284** | | **$1,676,484** |
| | | **Total:** | **3,263,007** | | **$48,847,953** |

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

100.   By reason of their positions as officers, directors, and/or fiduciaries of LendingClub and because of their ability to control the business and corporate affairs of LendingClub, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage LendingClub in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of LendingClub and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

101.   Each director and officer of the Company owes to LendingClub and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

102.    In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Audit Committee Duties**

103.    In addition to these duties, the members of the Audit Committee owed specific duties to LendingClub under the Audit Committee's Charter to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

104.    Specifically, according to LendingClub's Audit Committee Charter, the Audit Committee's responsibilities include the principal functions of assisting the Board to:

- oversee the integrity of accounting and financial reporting processes of the Company and the audits of the financial statements of the Company;

- monitor the periodic reviews of the adequacy of the accounting and financial reporting processes, procedures, and systems of controls (internal and disclosure) that are conducted by the Company's independent auditor and the Company's financial and senior management;

- monitor the Company's internal audit plan and monitor and evaluate the performance of the Company's internal audit function;

- select, and, if necessary, terminate the Company's independent auditor;

- review and evaluate the qualifications, independence, and performance of the Company's independent auditor;

- oversee the Company's systems of controls (internal and disclosure);

- review the Company's process for monitoring compliance with laws and regulations affecting financial reporting; and

- facilitate communication among the Company's independent auditor, the Company's financial and senior management and the Board.

105.    Specifically, regarding financial statements and disclosures, the members of the Audit Committee owed specific duties to LendingClub under the Audit Committee Charter to:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 32 -

1.  Review and discuss with management and the Company's independent auditor the periodic earnings releases that include the Company's quarterly and annual results prior to such release, including the use of any "pro forma" or "adjusted" non-GAAP information prior to distribution to the public or filing such statements with the SEC, as applicable.

2.  Review and approve for filing with the SEC, the Company's quarterly and annual financial statements, including any related notes or report on the Company's internal control over financial reporting, any report or opinion by the Company's independent auditor, and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to distribution to the public or filing with the SEC on Form 10-K or 10-Q, as applicable.

3.  In connection with the Committee's review of the Company's annual financial statements:

    •   Discuss the Company's financial statements, and the results of the independent auditor's audit of the financial statements with the independent auditor, any internal audit department and management;

    •   Discuss any items required to be communicated by the independent auditor in accordance with *PCAOB Auditing Standards No. 16, Communications with Audit Committees*. These discussions should include the independent auditor's judgments about the quality and appropriateness of the Company's accounting principles, the reasonableness of significant judgments, the clarity of the disclosures in the Company's financial statements and any significant problems or difficulties encountered during the course of the audit, including any restrictions on the scope of work or access to required information and any significant unresolved disagreements with management, as well as management's response to any such problems or difficulties;

    •   Discuss, with the Company's management and independent auditor, the Company's selection, application and disclosure of critical accounting policies and procedures including the effects of alternative GAAP methods; and the effect of regulatory and accounting initiatives and off-balance sheet structures on the Company's financial statements; and

    •   Recommend to the Board whether the annual financial statements should be included in the Company's Annual Report on Form 10-K;

4.  In connection with the Committee's review of the Company's quarterly financial statements:

    •   Discuss with the independent auditor and management, the results of the independent auditor's review of the quarterly financial statements under SAS No. 100, Interim Financial Information (Codification of Statements on Auditing Standards, AU § 722) or similar;

    •   Discuss significant issues, events and transactions and any significant changes regarding accounting principles, practices,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 33 -

policies, judgments or estimates with management and, at such time as the Company's independent auditors are engaged to perform a review of the company's quarterly financial statements, the independent auditor, including the effects of alternative GAAP methods; and the effect of regulatory and accounting initiatives and off-balance sheet structures on the Company's financial statements, resolution of any disagreements between the Company's management and independent auditor regarding financial reporting; and

- Resolve any disagreements between the Company's management and the independent auditor regarding financial reporting.

5. Make recommendations to the Board regarding any other Board responsibilities relating to the Company's financial reporting.

6. If the Company has a class of securities registered under Section 12 of the Exchange Act, prepare the audit committee report to be included in the Company's proxy statement as required by SEC rules

7. Receive and review any disclosure from the company's CEO and CFO made in connection with the certification of the company's quarterly and annual reports filed with the SEC.

106. Further, regarding internal controls, the members of the Audit Committee owed specific duties to LendingClub under the Audit Committee Charter to:

1. Discuss with the independent auditor, internal audit and management their periodic reviews of the adequacy and effectiveness of the Company's accounting and financial reporting processes and systems of internal control over financial reporting, including: the adequacy and effectiveness of the systems of reporting to the Committee by each group, any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's system of internal control and any special audit steps adopted in light of any material control deficiencies.

2. Discuss any comments or recommendations of the independent auditor outlined in its annual management letter or internal control reports, and approve a schedule for implementing any recommended changes and monitor compliance with the schedule.

3. Review the Company's major financial risk exposures and the steps management has taken to monitor such exposures, including the Company's policies and procedures with respect to risk assessment and risk management.

4. Establish procedures to receive, retain, assess and respond to complaints received by the Company regarding accounting, internal accounting controls or auditing matters, including confidential anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters; review any such complaints and submissions that have been received, including the current status and the resolution if one has been reached.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 34 -

5. Review any fraud involving management or any employee of the Company with a significant role in the Company's internal controls over financial reporting that are disclosed to the Committee.

6. Review management's ability to override the Company's internal controls.

107. The Company Audit Committee Charter referenced above was effective December 15, 2015. Upon information and belief, the Company maintained a version of the Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Board as those set forth above.

**Risk Committee Duties**

108. In addition to their general duties, the members of the Risk Committee owed specific duties to LendingClub under the Risk Committee's Charter to:

- Provide oversight of the Company's risk management structure;

- Provide oversight of the Company's risk management and risk assessment guidelines and policies regarding, credit, operational, technology, security, legal and compliance risk and such other risks as appropriate;

- Provide input and support of the Company's analysis of its risk management structure and entity wide risk tolerance;

- Monitor the Company's enterprise risk management plan and monitor and evaluate the performance of the Company's risk management function; and

- Discuss emerging risks that may be applicable to the Company and evaluate potential remediation plans; provide a forum to discuss risk scenarios.

109. Specifically, regarding risk management, the members of the Risk Committee owed specific duties to LendingClub under the Risk Committee Charter to:

1. Review or discuss, as and when appropriate, with management, including the Chief Risk Officer, the Company's risk governance structure and the Company's risk management and risk assessment guidelines and policies regarding credit, operational, technology, security, legal and compliance risk and the Company's risk tolerance.

2. Review at least quarterly the major risk exposures of the Company and its business units, including, credit, operational, technology, security, legal and compliance risks, against established risk measurement methodologies and the steps management has taken to monitor and control such exposures.

3. Receive (i) reports from the Chief Risk Officer at least quarterly (and other internal departments as necessary to fulfill the Committee's duties and responsibilities) and (ii) reports, as and when appropriate, from the Head of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 35 -

the Internal Audit Department regarding the results of risk management reviews and assessments.

**Oversight of Risk Tolerance**

4. Receive, as and when appropriate, reports and recommendations from management and the Company's internal Risk Committee (TORC – Technology, Operations, Risk and Compliance) on risk tolerance.

5. Oversee the Company's process and policies for determining risk tolerances and review management's measurement and comparison of overall risk tolerance to established levels.

**Oversight of Enterprise Risk Management Program**

6. Review or discuss, as and when appropriate, the Company's enterprise risk management plans and programs.

**General**

7. Make such recommendations to the Board and its committees as the Committee may consider necessary or appropriate and consistent with its purpose, and take such other actions and perform such other services as may be referred to it from time to time by the Board or required under the federal securities laws or rules of any stock exchange on which the Company's equity is listed.

110. Pursuant to the Company's Risk Committee Charter, as a qualification of membership on the Risk Committee, each member of the Committee must be "free from any relationship that, in the opinion of the Board, would interfere with the exercise of independent judgment as a Committee member . . . ."

111. The Company Risk Committee Charter referenced above was approved March 11, 2015. Upon information and belief, the Company maintained a version of the Risk Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Board as those set forth above.

**Duties Pursuant to the Company's Code of Conduct and Ethics**

112. Additionally, the Individual Defendants, as officers and/or directors of LendingClub, are bound by the Company's Code of Conduct and Ethics (the "Code") which, according to the Code, was adopted to "set high standards of ethical business conduct and provide guidance applicable to every employee, including every officer, and director of the Company."

Thus, all directors and employees are bound by specific disclosure controls and procedures, including:

- No director or employee may take or authorize any action that would cause the Company's financial records or financial disclosures to fail to comply with GAAP, the rules and regulations of the Securities and Exchange Commission or other applicable laws, rules and regulations;

- all directors and employees must cooperate fully with the Company's finance department, as well as the Company's independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that the Company's books and records, as well as its reports filed with the Securities and Exchange Commission, are accurate and complete; and

- no director or employee shall knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of the Company's reports filed with the Securities and Exchange Commission or any third party or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects.

> If any employee becomes aware that the Company's public disclosures are not full, fair and accurate, or if any employee becomes aware of a transaction or development that he or she believes may require disclosure, he or she should report the matter immediately to the Compliance Officer.

113.    In addition, the members of the Board are bound by the Company's Corporate Governance Guidelines (the "Guidelines"), which were adopted to assist the Board in exercising its responsibilities.

114.    Upon information and belief, the Company maintained a version of the Code and the Guidelines during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Board as those set forth above.

**Control, Access, and Authority**

115.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of LendingClub, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by LendingClub.

116.    Because of their advisory, executive, managerial, and directorial positions with LendingClub, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of LendingClub.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                      - 37 -

117.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of LendingClub, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

118.   To discharge their duties, the officers and directors of LendingClub were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.   By virtue of such duties, the officers and directors of LendingClub were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d)     remain informed as to how LendingClub conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)     ensure that LendingClub was operating in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

119.   Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to LendingClub and its shareholders the fiduciary duties of loyalty and good faith,

and the exercise of due care and diligence in the management and administration of the affairs of LendingClub, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of LendingClub, the absence of good faith on their part, and a reckless disregard for their duties to LendingClub and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to LendingClub.

120. The Individual Defendants each breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

121. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Actions that allege violations of the federal securities laws. As a result, LendingClub has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

122. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

123. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

124. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust

1  enrichment; and (b) disguise and misrepresent the Company's actual business and financial
2  prospects.

3       125.    The Individual Defendants accomplished their conspiracy, common enterprise,
4  and/or common course of conduct by causing the Company to purposefully, recklessly, or
5  negligently release improper statements.  Because the actions described herein occurred under the
6  authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial
7  participant in the conspiracy, common enterprise, and/or common course of conduct complained
8  of herein.

9       126.    Each of the Individual Defendants aided and abetted and rendered substantial
10  assistance in the wrongs complained of herein.  In taking such actions to substantially assist the
11  commissions of the wrongdoing complained of herein, each Individual Defendant acted with
12  knowledge of the primary wrongdoing, substantially assisted the accomplishment of that
13  wrongdoing, and was aware of his or her overall contribution to and furtherance of the
14  wrongdoing.

15                          **DAMAGES TO LENDINGCLUB**

16       127.    As a result of the Individual Defendants' wrongful conduct, LendingClub
17  disseminated false and misleading statements and omitted material information to make such
18  statements not false and misleading when made.  The improper statements have devastated
19  LendingClub's credibility.  LendingClub has been, and will continue to be, severely damaged and
20  injured by the Individual Defendants' misconduct.

21       128.    As a direct and proximate result of the Individual Defendants' actions as alleged
22  above, LendingClub's market capitalization has been substantially damaged, losing hundreds of
23  millions of dollars in value as a result of the conduct described herein.

24       129.    Further, as a direct and proximate result of the Individual Defendants' conduct,
25  LendingClub has expended and will continue to expend significant sums of money.  Such
26  expenditures include, but are not limited to:

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 40 -

(a)    costs incurred in investigating and defending LendingClub and certain officers in the pending Securities Class Actions, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

(b)    costs incurred in connection with government investigations into the Company's, *inter alia*, lending practices;

(c)    costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on LendingClub's artificially-inflated stock price; and

(d)    costs incurred from the loss of the Company's customers' confidence in LendingClub's products.

130.    Moreover, these actions have irreparably damaged LendingClub's corporate image and goodwill. For at least the foreseeable future, LendingClub will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that LendingClub's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

131.    Plaintiff brings this action derivatively in the right and for the benefit of LendingClub to redress injuries suffered, and to be suffered, by LendingClub as a direct result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. LendingClub is named as a nominal defendant solely in a derivative capacity.

132.    Plaintiff will adequately and fairly represent the interests of LendingClub in enforcing and prosecuting its rights.

133.    Plaintiff was a shareholder of LendingClub common stock at the time of the wrongdoing of which Plaintiff complains, and has been continuously since.

134.    Plaintiff did not make a pre-suit demand on the Board to pursue this action because such a demand would have been a futile and wasteful act.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT      - 41 -

135.     At the time this action was commenced, the Board of LendingClub consisted of the following seven (7) directors:  Morris, Mack, Meeker, Summers, Williams, Ciporin, and Crowe. A majority of these individuals are not disinterested and independent with respect to the acts and omissions alleged herein.  Moreover, each faces a substantial likelihood of personal liability for their breaches of the duties of trust, loyalty, good faith, candor, oversight, reasonable inquiry, supervision, and due care described herein.

**Demand is Futile as to All Director Defendants Because the Director Defendants Face a Substantial Likelihood of Liability**

136.     The Director Defendants face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its financial and business prospects were accurate.

137.     Further, the Director Defendants as directors (and in some cases, also as Audit Committee members) owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls and/or internal auditing and accounting controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

138.     The Director Defendants also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors.  The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 42 -

1    139.    The Director Defendants' making or authorization of false and misleading

2   statements throughout the Relevant Period, failure to timely correct such statements, failure to

3   take necessary and appropriate steps to ensure that the Company's internal controls or internal

4   auditing and accounting controls were sufficiently robust and effective (and/or were being

5   implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit

6   Committee's duties were being discharged in good faith and with the required diligence, and/or

7   acts of corporate waste and abuse of control constitute breaches of fiduciary duties, for which the

8   Director Defendants face a substantial likelihood of liability.  If the Director Defendants were to

9   bring a suit on behalf of LendingClub to recover damages sustained as a result of this misconduct,

10   they would expose themselves to significant liability.  This is something they will not do.  For this

11   reason, demand is futile.

12   **Demand is Futile as to the Audit Committee Defendants**

13    140.    The Audit Committee Defendants (Crowe, Morris, and Williams) were responsible

14   for, among other things, reviewing and approving quarterly and annual financial statements and

15   earnings press releases, overseeing LendingClub's internal controls over financial reporting, and

16   discharging their other duties described herein.   Despite these duties, the Audit Committee

17   Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence

18   and reasonable care in reviewing and preventing the dissemination of false and/or materially

19   misleading earnings press releases and earnings guidance, and failed in their specific duties to

20   ensure that the Company's internal controls over financial reporting were sufficient and that

21   statements made by the Company regarding its business and financial prospects were accurate.

22   Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of

23   liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the

24   Audit Committee Defendants therefore is futile.

25   **Demand is Futile as to the Risk Committee Defendants**

26    141.    Pursuant to the Company's Risk Committee Charter, the Risk Committee

27   Defendants (Ciporin, Morris, Summers, and Williams (i.e., more than half the Board)) were

28   required to, among other things, as a qualification of membership on the Risk Committee, be

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 43 -

1  "free from any relationship that, in the opinion of the Board, would interfere with the exercise of

2  independent judgment as a Committee member . . . ."  The Risk Committee Defendants were also

3  required by the Risk Committee Charter to "take such . . . actions . . . required under the federal

4  securities laws . . . ."

5  142.   Despite these duties, the Risk Committee Defendants knowingly or recklessly

6  reviewed and approved, or failed to exercise due diligence and reasonable care in and reviewing

7  approving, an investment by LendingClub into Cirrix Capital, a fund Laplanche and Mack had

8  personally invested in.  In addition, the Risk Committee Defendants knowingly or recklessly

9  reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and

10  preventing the dissemination of false and/or materially misleading earnings press releases and

11  earnings guidance, and failed in their specific duties to ensure that statements made by the

12  Company regarding its business and financial prospects were accurate.  Accordingly, the Risk

13  Committee Defendants face a sufficiently substantial likelihood of liability for breach of their

14  fiduciary duties of loyalty and good faith.  Any demand upon the Risk Committee Defendants

15  therefore is futile.

16  **Demand is Futile as to Defendant Crowe for Additional Reasons**

17  143.   Defendant Crowe is the managing partner of Norwest Venture Partners, an

18  investment firm.  As a principal in Norwest Venture Partners, Crowe has interests that are not

19  aligned with public shareholders of LendingClub.  Instead, Crowe's longtime interests have lain

20  with Norwest Venture Partners—specifically, its objective to monetize (and liquidate) its

21  investments in LendingClub as expeditiously and profitably as possible, including following the

22  IPO.

23  144.   The general partner of Norwest Venture Partners X, L.P. is Genesis VC Partners

24  X, LLC.  The managing member of Genesis VC Partners X, LLC is NVP Associates, LLC.

25  Crowe, along with Promod Haque and Matthew Howard, are officers of NVP Associates, LLC.

26  Each of these individuals has shared voting and investment power over the shares held by

27  Norwest Venture Partners X, L.P.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 44

1         145.    Indeed, Norwest Venture Partners has dramatically decreased its holdings of the

2  Company's stock following the IPO. As of February 17, 2015, Norwest Venture Partners X, L.P.

3  held 50,822,020 shares of the Company. As of March 31, 2016, Norwest Venture Partners X,

4  L.P. had reduced its holdings to only 12,822,020 shares.

5  **Demand is Futile as to Various Directors for Additional Reasons**

6         146.    Demand is also futile as to Defendants Mack and Meeker due to their significant

7  business and social ties, which create conflicts rendering Mack and Meeker unable to objectively

8  and disinterestedly consider bringing the claims set forth herein against each other. Specifically,

9  Mack and Meeker worked together at Morgan Stanley from 1991 through 2010. In addition,

10  Morgan Stanley & Co. LLC was an underwriter of the Company's Offering, served as a financial

11  advisor, and assisted in the preparation and dissemination of LendingClub's false and misleading

12  Registration Statement. Due to these longstanding and current professional ties, Mack and

13  Meeker cannot and will not objectively and disinterestedly consider demands to bring the claims

14  set forth herein.

15         147.    Demand is also futile as to Defendants Morris, Summers, and Williams because of

16  their longstanding business and social ties with each other. Specifically, Morris, Summers, and

17  Williams have all worked at or provided services for Citigroup. In addition, Citigroup Global

18  Markets Inc. was an underwriter of the Company's Offering, served as a financial advisor, and

19  assisted in the preparation and dissemination of LendingClub's false and misleading Registration

20  Statement. Due to these longstanding and current professional ties, Morris, Summers, and

21  Williams cannot and will not objectively and disinterestedly consider demands to bring the claims

22  set forth herein.

23         148.    Demand is also futile as to Defendants Meeker and Summers because of their joint

24  membership on the board of directors for Square, a company developing and providing electronic

25  payment services. Both Meeker and Summers became directors on the board of Square in 2011.

26  As such, Meeker and Summers cannot independently and disinterestedly consider a pre-suit

27  demand to bring the claims set forth herein against each other.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT         - 45 -

149.     Demand is also futile as to Defendant Mack because Mack will not be able to objectively and disinterestedly consider a pre-suit demand to bring the claims set forth herein against Laplanche.  First, as is discussed herein at ¶¶ 7, 8, 81, on May 9, 2016, the Company disclosed "a failure to inform the board's Risk Committee of personal interests held in a third party fund while the Company was contemplating an investment in the same fund."  Media outlets subsequently reported that Laplanche had failed to fully disclose a personal interest he held in Cirrix Capital while the Company was contemplating investing in the fund—an investment that Laplanche had himself proposed to LendingClub's Risk Committee—and Mack also held an undisclosed interest in Cirrix Capital.  Additionally, LendingClub said its Risk Committee approved an investment by LendingClub itself into Cirrix Capital—without the knowledge of the prior investment by Laplanche.  Combined, the Company, Laplanche, and Mack owned at least 31% of Cirrix Capital, according to Bloomberg News, and Cirrix Capital has reportedly invested over $175 million into notes sold on the Company's marketplace. Laplanche's and Mack's personal investment in Cirrix Capital was a blatant conflict of interest the Board knew or should have known about prior to the Company's investment in Cirrix Capital, yet each Laplanche and Mack failed to disclose.  Further, as is discussed herein at ¶¶ 84, in January 2016, Mack provided Laplanche with "an old-fashioned version of a peer-to-peer loan" which amounted to a private bailout to Laplanche.  Following this personal bailout, Morgan Stanley, the firm for which Mack serves as CEO, provided a mortgage to Laplanche.  Without this financial bailout by Mack and Morgan Stanley, Laplanche would have been forced to sell part of his stake in the Company.  Based on Mack's previous actions in proving Laplanche with a financial bailout, Mack cannot independently and disinterestedly consider a pre-suit demand to bring the claims set forth herein against Laplanche.

150.     Finally, none of the Director Defendants are able to disinterestedly consider a demand to bring suit against themselves because each of the Director Defendants is named as a defendant in the State Securities Class Actions which allege that they made many of the same misstatements described herein (*see* ¶¶ 43-53, 154) in violation of the federal securities laws. Thus, if the Director Defendants were to initiate suit in this action they would compromise their

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                    - 46 -

1   ability to simultaneously defend themselves in the State Securities Class Actions and would

2   expose themselves to liability in this action.  This they will not do.

3   **Demand is Futile as to Each Director Defendant for Signing False and Misleading SEC**
    **Filings**

4

5       151.   Demand is futile as to each of the Director Defendants as a result of their signing

6   false and misleading Form 10-Ks, filed with the SEC.

7       152.   Specifically, each of the Director Defendants signed the Company's 2014 10-K

8   which, as is detailed in ¶¶ 56-58, 78, misrepresented or failed to disclose the following adverse

9   facts, which were known or recklessly disregarded by, among others, each of the Director

10  Defendants, but were concealed from the investing public: (i) LendingClub had an unsustainable

11  business model that was predicated on it being able to issue loans with extremely high and/or

12  usurious rates across the country; (ii) LendingClub's loan investors would not be able to enforce

13  the extremely high and/or usurious rates imposed by LendingClub because they violated state

14  usury laws; (iii) without the extremely high and/or usurious rates, the loans generated through

15  LendingClub's marketplace would not be attractive to investors because the loans had very high

16  credit risk and were subject to issues concerning insufficient documentation; (iv) a substantial

17  portion of LendingClub's loans were issued with rates in excess of those allowed by applicable

18  state usury laws; (v) LendingClub's internal controls were inadequate to ensure that the

19  Company's loans conformed to its customers' criteria; (vi) LendingClub's internal controls were

20  inadequate to ensure that relevant interests in third-party transactions were fully and timely

21  disclosed; (vii) LendingClub is not a "pure marketplace" and instead has direct exposure to some

22  of the loans it makes; and (viii) as a result of the foregoing, the Company's public statements

23  were materially false and misleading at all relevant times.

24      153.   Further, Demand is futile as to Director Defendants Crowe, Meeker, Morris, and

25  Williams (i.e., more than half the Board), each of whom signed the Company's 2015 10-K which,

26  as is detailed in ¶¶ 74-76, 78, misrepresented or failed to disclose the following adverse facts,

27  which were known or recklessly disregarded by, among others, Crowe, Meeker, Morris, and

28  Williams, but were concealed from the investing public: (i) LendingClub had an unsustainable

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                          - 47 -

business model that was predicated on it being able to issue loans with extremely high and/or usurious rates across the country; (ii) LendingClub's loan investors would not be able to enforce the extremely high and/or usurious rates imposed by LendingClub because they violated state usury laws; (iii) without the extremely high and/or usurious rates, the loans generated through LendingClub's marketplace would not be attractive to investors because the loans had very high credit risk and were subject to issues concerning insufficient documentation; (iv) a substantial portion of LendingClub's loans were issued with rates in excess of those allowed by applicable state usury laws; (v) LendingClub's internal controls were inadequate to ensure that the Company's loans conformed to its customers' criteria; (vi) LendingClub's internal controls were inadequate to ensure that relevant interests in third-party transactions were fully and timely disclosed; (vii) LendingClub is not a "pure marketplace" and instead has direct exposure to some of the loans it makes; and (viii) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

154.    Similarly, demand is futile as to each of the Director Defendants as a result of their signing the false and misleading Registration Statement as is detailed herein at ¶¶ 43-53. Specifically, the statements made in the Registration Statement were materially false and misleading when made because the Company failed to disclose the following material facts: (i) LendingClub had an unsustainable business model that was predicated on it being able to issue loans with extremely high and/or usurious rates across the country; (ii) LendingClub's loan investors would not be able to enforce the extremely high and/or usurious rates imposed by LendingClub because they violated state usury laws; (iii) without the extremely high and/or usurious rates, the loans generated through LendingClub's marketplace would not be attractive to investors because the loans had very high credit risk and were subject to issues concerning insufficient documentation; (iv) a substantial portion of LendingClub's loans were issued with rates in excess of those allowed by applicable state usury laws; and (v) LendingClub is not a "pure marketplace" and instead has direct exposure to some of the loans it makes.

**Demand is Futile Based on Insider Selling**

155.    Demand is futile as to Director Defendants Meeker, Summers, Ciporin, and Crowe (i.e., more than half the Board) because, as alleged herein, each engaged in insider trading activity at a time when each of them knew of adverse, material, non-public information about the Company's financial outlook that was not being disclosed to shareholders.

156.    On the basis of this non-public information, Meeker, Summers, Ciporin, and Crowe timed their sales to maximize profit from LendingClub's then artificially inflated stock price.

157.    As a result of these illicit insider sales, Meeker, Summers, Ciporin, and Crowe each received direct financial benefits not shared with LendingClub shareholders, and are therefore each directly interested in a demand.  Further, Meeker, Summers, Ciporin, and Crowe each are interested in a demand because they face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith based on their challenged insider sales.  As such, demand upon Meeker, Summers, Ciporin, and Crowe is futile.

**Demand is Futile as to the Director Defendants for Additional Reasons**

158.    LendingClub's Board has already demonstrated that it cannot independently and disinterestedly consider a pre-suit demand to bring the claims set forth herein.  Despite the wrongdoing of Defendants through their false and misleading statements, the Board has taken no serious action to address the harm this misconduct has caused to the Company.

159.    Each of the Director Defendants have received restricted stock units ("RSUs") and stock options awards to purchase hundreds of thousands of shares of common stock merely for being appointed to the Board.  This compensation provides a substantial stipend to these directors, from which each of them personally benefits, depending for his or her livelihood in substantial part on LendingClub.

160.    According to the Company's latest Proxy Statement, in addition to an annual cash retainer of $40,000, each non-employee member of the Company's Board receives (i) an equity award upon initial election to the Board having a value equal to at least $574,000 and a four-year

1  vesting schedule, and (ii) an annual equity award having a value of $200,000 that vests quarterly
2  over one-year.

3      161.    Thus, demand on each of the Director Defendants is futile because, through their
4  course of conduct to date, they have demonstrated their unwillingness to undertake any action that
5  would threaten the economic benefits they receive or will receive for continuing to serve as
6  directors on LendingClub's Board.

7      162.    If LendingClub's current officers and directors are protected against personal
8  liability for their breaches of fiduciary duties alleged in this Complaint by Directors & Officers
9  Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for
10  their protection with corporate funds, *i.e.*, monies belonging to the shareholders.  However,
11  Plaintiff is informed and believes that the D&O Insurance policies covering the Individual
12  Defendants in this case contain provisions that eliminate coverage for any action brought directly
13  by LendingClub against the Individual Defendants, known as the "insured versus insured
14  exclusion."

15      163.    As a result, if the Director Defendants were to sue themselves or certain of the
16  officers of LendingClub, there would be no D&O Insurance protection, and thus, this is a further
17  reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively,
18  as this action is brought, such insurance coverage exists and will provide a basis for the Company
19  to effectuate recovery.  Therefore, the Director Defendants cannot be expected to file the claims
20  asserted in this derivative lawsuit because such claims would not be covered under the
21  Company's D&O Insurance policy.

22      164.    Under the factual circumstances described herein, the Individual Defendants are
23  more interested in protecting themselves than they are in protecting LendingClub by prosecuting
24  this action.  Therefore, demand on LendingClub and its Board is futile and is excused.

25      165.    LendingClub has been and will continue to be exposed to significant losses due to
26  the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits
27  against themselves or others who were responsible for the wrongful conduct.  Thus, the Director

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                          - 50 -

1   Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial

2   likelihood of liability for their breaches, rendering any demand upon them futile.

3       166.   Plaintiff has not made any demand on shareholders of LendingClub to institute

4   this action since such demand would be a futile and useless act for the following reasons:

5           (a)    LendingClub is a publicly traded company with thousands of shareholders of

6               record and at least hundreds of thousands of beneficial owners;

7           (b)    Making demand on such a number of shareholders would be impossible for

8               Plaintiff, who has no means of collecting the names, addresses, or phone

9               numbers of LendingClub shareholders; and

10          (c)    Making demand on all shareholders would force Plaintiff to incur excessive

11              expenses and obstacles, assuming all shareholders could even be individually

12              identified with any degree of certainty.

## COUNT I

### Against the Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934

16      167.   Plaintiff incorporates by reference and realleges each and every allegation

17  contained above, as though fully set forth herein.

18      168.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall

19  be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

20  commerce or of any facility of a national securities exchange or otherwise, *in contravention of*

21  *such rules and regulations as the [SEC] may prescribe* as necessary or appropriate in the public

22  interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

23  proxy or consent or authorization in respect of any security (other than an exempted security)

24  registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

25      169.   Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides

26  that no proxy statement shall contain "any statement which, at the time and in the light of the

27  circumstances under which it is made, is false or misleading with respect to any material fact, or

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT        - 51 -

1  which omits to state any material fact necessary in order to make the statements therein not false

2  or misleading . . . ." 17 C.F.R. § 240.14a-9.

3        170.   The Company's Proxy Statement violated Section 14(a) and Rule 14a-9 by

4  misrepresenting or failing to disclose that: (i) LendingClub had an unsustainable business model

5  that was predicated on it being able to issue loans with extremely high and/or usurious rates

6  across the country; (ii) LendingClub's loan investors would not be able to enforce the extremely

7  high and/or usurious rates imposed by LendingClub because they violated state usury laws;

8  (iii) without the extremely high and/or usurious rates, the loans generated through LendingClub's

9  marketplace would not be attractive to investors because the loans had very high credit risk and

10  were subject to issues concerning insufficient documentation; (iv) a substantial portion of

11  LendingClub's loans were issued with rates in excess of those allowed by applicable state usury

12  laws; (v) LendingClub's internal controls were inadequate to ensure that the Company's loans

13  conformed to its customers' criteria; (vi) LendingClub's internal controls were inadequate to

14  ensure that relevant interests in third-party transactions were fully and timely disclosed;

15  (vii) LendingClub is not a "pure marketplace" and instead has direct exposure to some of the

16  loans it makes; and (viii) as a result of the foregoing, the Company's public statements were

17  materially false and misleading at all relevant times.

18        171.   In the exercise of reasonable care, the Individual Defendants should have known

19  that by misrepresenting or failing to disclose these material facts, the statements contained in the

20  Proxy Statement were materially false and misleading.  The misrepresentations and omissions

21  were material to Plaintiff in voting on the matters set forth for shareholder determination in the

22  Proxy Statement, including but not limited to, election of directors, approval of officer

23  compensation, and appointment of an independent auditor.

24        172.   The Company was damaged as a result of defendants' material misrepresentations

25  and omissions in the Proxy Statement.

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT          - 52 -

**COUNT II**

**Against the Individual Defendants for Breach of Fiduciary Duties**

173.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

174.   The Individual Defendants owed and/or owe LendingClub fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and/or owe LendingClub the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

175.   The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

176.   The Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

177.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, LendingClub has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

178.   Plaintiff, on behalf of LendingClub, has no adequate remedy at law.

**COUNT III**

**Against the Individual Defendants for Unjust Enrichment**

179.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

180.   By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of LendingClub.

181.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to LendingClub.

182.   Further, the Insider Selling Defendants sold or caused to be sold LendingClub common stock while in possession of material, adverse non-public information that artificially

inflated the price of LendingClub stock.  As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

183.    Plaintiff, as a shareholder and representative of LendingClub, seeks restitution from defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by defendants from their wrongful conduct and fiduciary breaches.

184.    Plaintiff, on behalf of LendingClub, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

185.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

186.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and on-going harm to the Company.

187.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) by paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

188.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

189.    Plaintiff, on behalf of LendingClub, has no adequate remedy at law.

## COUNT V

### Against the Insider Selling Defendants for Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information

190.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

191.    At the time the Insider Selling Defendants sold their LendingClub stock, they knew the information described above, and sold LendingClub stock on the basis of such information.

192.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants misappropriated to their own benefit when they sold LendingClub stock.

193.    The Insider Selling Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

194.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

195.    Plaintiff, on behalf of LendingClub, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all defendants for the amount of damages sustained by the Company as a result of defendants' violations of federal law, breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and insider selling;

B.    Directing LendingClub to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect LendingClub and its shareholders from a repeat of the damaging events described herein, including but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws and/or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Company's financial controls;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 55 -

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a provision to strengthen the Company's oversight and controls over insiders' purchases and sales of Company stock;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of LendingClub's directors, executives, and other employees;

- a proposal to require an independent Chairman of the Board;

- a provision to permit the shareholders of LendingClub to nominate at least three candidates for election to the Board to replace existing directors;

- a provision eliminating the classification of the Board and requiring that all directors elected at or after any annual meeting be elected on an annual basis;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test and then strengthen the Company's internal operational control functions;

C.      Awarding to LendingClub restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED:  June 6, 2016                    JOHNSON & WEAVER, LLP


                                         _s/Frank J. Johnson_
                                         FRANK J. JOHNSON


VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                          - 56 -

1   600 West Broadway, Suite 1540
    San Diego, CA  92101
2   Telephone: (619) 230-0063
    Facsimile: (619) 255-1856
3   frankj@johnsonandweaver.com

4   JOHNSON & WEAVER, LLP
    Michael I. Fistel, Jr.
5   40 Powder Springs Street
    Marietta, GA 30064
6   Telephone: (770) 200-3104
    Facsimile: (770) 200-3101
7   Email: michaelf@johnsonandweaver.com

8   *Attorneys for Plaintiff*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DocuSign Envelope ID: A990023E-35F1-49FE-A0CE-98036649B181

## __VERIFICATION__

I, Bart Stadnicki, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of LendingClub Corporation and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of LendingClub Corporation common stock since December 11, 2014.

06/02/16
_____

Date

DocuSigned by:

*Bart Stadnicki*
_____

BART STADNICKI

1